## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SHADWRICK J. VICK,
derivatively on behalf of
VINCO VENTURES, INC.,

        *Plaintiff*,

    v.

HUDSON BAY MASTER FUND LTD.,
SANDER R. GERBER, YOAV ROTH,
BHP CAPITAL NY, INC., and
BRYAN PANTOFEL,

        *Defendants*,

    and

VINCO VENTURES, INC.,

        *Nominal Defendant*.

Civil Action No. _____

**VERIFIED SHAREHOLDER**
**DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION[1]

Plaintiff Shadwrick J. Vick ("Plaintiff"), by and through Plaintiff's undersigned attorneys, derivatively and on behalf of Vinco Ventures, Inc. ("Vinco" or the "Company") files this Verified Shareholder Derivative Complaint against defendants Hudson Bay Master Fund Ltd. ("Hudson Bay"), Sander Gerber ("Gerber"), Yoav Roth ("Roth"), BHP Capital NY, Inc. ("BHP Capital," and together with Hudson Bay, the "Dealer Defendants"), and Bryan Pantofel ("Pantofel") (collectively, the "Defendants").  Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based

---

[1]     Attached hereto as **Exhibit 1** is a Table of Defined Terms.  Unless otherwise defined herein, all capitalized terms shall have the meaning set forth in the Table of Defined Terms.

upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included among other things, a review of public documents, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Vinco, legal filings, news reports, information readily obtainable on the internet, and interviews with former directors, officers and employees of Vinco. Plaintiff believes that further evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

<u>**NATURE OF THE ACTION**</u>

1.      The Dealer Defendants are "death spiral" or "toxic" lenders:[2] unregistered securities dealers that make unlawful, predatory loans to publicly traded companies in need of cash.[3, 4]  Toxic lenders like the Dealer Defendants purport to be investors who 'help' companies, but the reality is very much the opposite: the Dealer Defendants are not investors, but rather *creditors* that, in keeping with typical toxic lending arrangements, give themselves the right to take payment of the debt in company stock, but with a substantial discount to the market price. Unlike typical private-placement investors that hold stock for a period of time, the Dealer Defendants can immediately dump the stock into the public market to reap the difference between the discount and

---

[2]   *See* SEC DISCUSSION (AND WARNINGS) ABOUT TOXIC LENDING AND CONVERTIBLE SECURITIES, *available at* https://www.investor.gov /introduction-investing/investing-basics/glossary/convertible-securities (last accessed on January 19, 2024).

[3]   Based on a review of the filings in the EDGAR database from 2010 to 2023, Hudson Bay has engaged in financing similar to this case with at least 53 other companies, resulting in approximately 120 securities transactions with at least 317,297,570 shares being issued, with an estimated open market value of hundreds of millions of dollars, conservatively. *See* **Exhibit 2** (EDGAR Spreadsheet, listing securities transactions by Hudson Bay identified in issuer EDGAR filings).

[4]   Based on a review of the filings in the EDGAR database from 2018 to 2022, BHP Capital has engaged in financing similar to this case with at least 34 other companies, resulting in approximately 112 securities transactions with at least 626,882,666 shares being issued, with an estimated open market value of hundreds of millions of dollars, conservatively. *See* **Exhibit 3** (EDGAR Spreadsheet, listing securities transactions by BHP Capital identified in issuer EDGAR filings).

the market price.  Moreover, because they can convert the debt in tranches, the Dealer Defendants are able to dump large quantities of the newly issued stock into the market and remain unaffected by the price depression that its selling tends to cause.

2.      The Hudson Bay Transactions in this case are a masterful example of toxic lending. In three separate convertible promissory notes, Hudson Bay loaned to Vinco a combined total of $122,000,000.  As repayment of those notes, and through exercising the accompanying warrants acquired pursuant to securities purchase agreements, Hudson Bay extracted ***more than $418 million dollars*** in newly issued shares of company stock from Vinco, which it immediately sold into the public market.

3.      Additionally, BHP Capital effected three separate warrant transactions with Vinco and exercised its warrant shares, thereby acquiring newly issued shares of the Company's common stock, which, upon information and belief, it immediately sold into the public market for substantial profit.

4.      According to the SEC, the Dealer Defendants' business model is not simply predatory, it is patently unlawful.  In several recent civil actions, the SEC has prosecuted toxic lenders for unlawfully operating as unregistered securities dealers, in violation of § 15(a) of the Securities Exchange Act of 1934 (the "Act") (15 U.S.C. § 78o).  ***Every single court to address this issue has agreed with the SEC***.[5]

---

[5]      *See*, *e.g.*, *SEC v. Morningview Fin. LLC*, 2023 U.S. Dist. LEXIS 199697 (S.D.N.Y. Nov. 7, 2023); *SEC v. LG Capital Funding, LLC*, 2023 U.S. Dist. LEXIS 202929 (E.D.N.Y. Nov. 13, 2023); *SEC v. Crown Bridge Partners, LLC*, 2022 U.S. Dist. LEXIS 142555 (S.D.N.Y. Aug. 8, 2022); *SEC v. GPL Ventures LLC*, 2022 U.S. Dist. LEXIS 9056 (S.D.N.Y. Jan. 18, 2022); *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015); *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, 2022 U.S. Dist. LEXIS 11692 (S.D. Fla. Jan. 21, 2022); *SEC v. Fierro*, 2020 U.S. Dist. LEXIS 238936 (D.N.J. Dec. 18, 2020); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fife*, 2021 U.S. Dist. LEXIS 242126 (N.D. Ill. Dec. 20, 2021) (the "SEC cases"). For private civil actions seeking rescission based on failure to register, *see Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy*, 6 F.4th 50 (1st Cir. 2021), *Auctus Fund, LLC v. Players Network, Inc.*, 2021 U.S. Dist. LEXIS 259634 (D. Mass. Dec. 10, 2021), and most recently *Carebourn Capital, L.P. v. DarkPulse, Inc.*, 2023 Minn. Dist. LEXIS 1732 (Hennepin Cnty. Apr. 21, 2023).

5.      The toxic lenders under scrutiny in the SEC enforcement actions use the Dealer Defendants' *precise* business model and—like the Dealer Defendants—refrain from registering with the SEC as a dealer in order to evade regulatory oversight and continue making predatory loans that generate outrageous profits.

6.      The remedy sought by the SEC in those cases (and awarded in 100% of the cases that have progressed to judgment) is disgorgement of profits and cancellation of any remaining securities.  *See SEC v. Almagarby*, 2021 U.S. Dist. LEXIS 186477 (S.D. Fla. Sep. 29, 2021) (Order).

7.      Similarly, in addition to other remedies, the remedy sought by Plaintiff here is rescission of the Securities Agreements pursuant to § 29(b) of the Act, on the ground that each of the contracts were made, as well as performed, in violation of § 15(a) of the Act.  *See* 15 U.S.C. § 78o.

## JURISDICTION AND VENUE

8.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court has subject matter jurisdiction over this case pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Act.

10.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a company conducting business and maintaining operations in this District or is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (3) because the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

12.     Notwithstanding that the Securities Agreements are void under the Act and must be rescinded in their entirety by the Court for the reasons stated herein, Defendants should be estopped from denying that jurisdiction or venue is proper in this Court because the Securities Agreements expressly provide that any action brought by either party concerning the transactions contemplated therein must be brought in state or federal courts located in the State of New York.[6]

## THE PARTIES

### Plaintiff Shadwrick J. Vick

13.     Plaintiff Shadwrick J. Vick is a current shareholder of Vinco common stock. Plaintiff has continuously held Vinco common stock at all relevant times.  Plaintiff resides in Fayetteville, Georgia.

### Nominal Defendant Vinco Ventures, Inc.

14.     Vinco is a Nevada corporation with its last known principal executive offices located at 24 Aspen Park Blvd, Syracuse, New York 13057.  Vinco's common stock traded on the Nasdaq Exchange under the ticker symbol "BBIG" before the Company was delisted on October 23, 2023.  Vinco's common stock currently trades on the over-the-counter ("OTC") market.

---

[6]    *See, e.g.*, January SPA § 25 (**Exhibit 4**); January Note § 25 (**Exhibit 5**); February SPA § 11(d) (**Exhibit 8**); February Note § 25 (**Exhibit 9**); July SPA § 10(a) (**Exhibit 19**); July Note § 27 (**Exhibit 20**).

**Defendant Hudson Bay Master Fund Ltd.**

15.     Hudson Bay is a limited company organized under the laws of the Cayman Islands, and maintains its principal offices at 777 Third Avenue, 30th Floor, New York, New York 10017. Hudson Bay is not—and never has been—registered with the SEC in any capacity.

**Defendant Sander Gerber**

16.     Gerber is a managing partner, chief executive officer and chief investment officer of Hudson Bay Capital Management LP ("HB Capital"), which is the manager of Hudson Bay. Gerber is also the managing member of Hudson Bay Capital GP LLC, which is the general partner of HB Capital.  Upon information and belief, Gerber is a signatory to several of the Hudson Bay Transactions.  Upon information and belief, Gerber resides in New York, New York.  Gerber is not—and never has been—registered with the SEC in any capacity.

**Defendant Yoav Roth**

17.     Roth is a senior managing director and portfolio manager at HB Capital, which is the manager of Hudson Bay.  Roth is a signatory to several of the Hudson Bay Transactions.  Upon information and belief, Roth resides in North Beach Miami, Florida.  Roth is not—and never has been—registered with the SEC in any capacity.

**Defendant BHP Capital NY, Inc.**

18.     BHP Capital is a New York corporation with offices located at 245 East 40th Street #28B, New York, NY, 10016, and its principal place of business in Miami, Florida.  BHP Capital is not—and never has been—registered with the SEC in any capacity.[7]

---

[7]    On June 16, 2023, the SEC filed a Complaint against the BHP Defendants for failing to register with the SEC as securities dealers.  *See SEC v. BHP Capital NY, Inc. et al*, Case No. 1:23-cv-22233 (S.D. Fla. June 16, 2023) (ECF 1).  Shortly thereafter, the BHP Defendants settled the charges against them and agreed to pay more than $2.5 million in monetary relief and have BHP Capital surrender for cancellation the securities it allegedly obtained from its unregistered dealer activity.  *See* U.S. SECURITIES AND EXCHANGE COMMISSION, Litigation Release No. 25749, *available at* https://www.sec.gov/help/foiadocsbdfoia (last accessed January 19, 2024).

**Defendant Bryan Pantofel**

19.     Pantofel is the sole officer of BHP Capital and exercises ultimate decision-making authority over its business.  Upon information and belief, Pantofel resides in Miami, Florida. Pantofel is not—and never has been—registered with the SEC in any capacity.

**RELEVANT NON-PARTIES**

**Hudson Bay Capital Management LP**

20.     HB Capital is a Delaware limited partnership with its principal place of business located at 777 Third Avenue, 30th Floor, New York, NY 10017.  HB Capital is the investment manager of Hudson Bay and has voting and investment power over the securities subject to this litigation.[8] HB Capital is not—and never has been—registered as a securities dealer with the SEC.

**Theodore Farnsworth**

21.     Theodore Farnsworth ("Farnsworth") was a co-founder of ZASH Global Media Entertainment Corporation ("ZASH") and ZVV Global Media Partners, LLC ("ZVV"), and was appointed co-CEO of Vinco on July 8, 2022, for a brief period.  Farnsworth is currently incarcerated in connection with a criminal case pending in the District Court for the Southern District of Florida, in which he was indicted on one count of securities fraud and three counts of wire fraud for his alleged role in a scheme to defraud investors of Helios & Matheson Analytics

---

[8]     In 2013, HB Capital was sanctioned by the SEC for violations of Rule 105 of Regulation M of the Exchange Act. *See Hudson Bay Capital Management LP*, No. 3-15478 (Sept. 16, 2013), *available at* https://www.sec.gov/files/litigation/admin/2013/34-70399.pdf (last accessed January 19, 2024).  Pursuant to the Commission's Order, HB Capital was required to cease and desist from committing or causing any violations and any future violations of Rule 105 of Regulation M of the Exchange Act, and pay disgorgement of $665,674.96, prejudgment interest of $11,661.31 and a civil money penalty in the amount of $272,118 (for a total of $949,454.27). *Id.*

Inc. ("HMNY"), a publicly traded Florida- and New York-based company that was the parent of

MoviePass Inc. ("MoviePass").[9]

### Roderick Vanderbilt

22.    Roderick Vanderbilt ("Vanderbilt") is Chairman of the Board of Directors of the

Company.  Vanderbilt co-founded ZASH with Farnworth and served as the President of ZASH

and as a ZASH Manager on the board of ZVV.  Vanderbilt has a pre-existing business relationship

with Farnsworth, who is the controlling shareholder of ZASH.  Vanderbilt also has a pre-existing

personal relationship with Farnsworth as his domestic partner.

### Jesse Law

23.    Jesse Law ("Law") is a Director of the Company and previously served as a ZASH

Manager of ZVV.[10]

## APPLICABLE FEDERAL STATUTES

24.    The Act defines a "security" as:

[A]ny note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest

---

[9]    *See United States v. Theodore Farnsworth and J. Michell Lowe, Pending Criminal Division Cases*, *available at* https://www.justice.gov/criminal/criminal-vns/case/united-states-v-theodore-farnsworth-and-j-michell-lowe.

[10]    On December 6, 2023, Law was indicted for (1) offering a false instrument for filing or record, a Category "C" felony in violation of NRS 239.330, and (2) uttering forged instruments: forgery, a Category "D" felony in violation of NRS 205.110.  *See The State of Nevada v. Jesse Law, et al.*, No. C-23-379122-3 (Nev. Dist. Ct., Clark Cty.) (Indictment), *available at* https://ag.nv.gov/uploadedFiles/ag.nv.gov/Content/News/PR/PR_Docs/2022(1)/Indictment%20-%20SIgned-Law.pdf.

or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1).

25.    Under the Act:

The term "dealer" means any person engaged in the business of buying and selling securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account through a broker or otherwise.

15 U.S.C. § 78c(a)(5).

26.    The SEC requires dealers to register, and promulgates as follows:

It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1).

27.    Contracts that are made in violation of any provision under Section 15 of the Act

are codified as follows:

**Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder**, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, **shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made** or engaged in the performance of **any such contract…**

15 U.S.C. § 78cc(b) (emphasis added).

## FACTUAL ALLEGATIONS

**I.    THE DEALER DEFENDANTS' GENERAL BUSINESS MODEL**

### A.    The Dealer Defendants Converted and Exercised Notes and Warrants into Stock at a Substantial Discount

28.    The convertible securities that the Dealer Defendants bought and/or solicited from the issuers allowed them to acquire newly-issued stock at a substantial discount.

29.    Certain convertible note agreements imposed additional default penalties on issuers if the Dealer Defendants encountered difficulty depositing the stock with brokerages, or if the issuer defaulted on the note.

30.    Similarly, the agreements included draconian prepayment provisions that discouraged and penalized the issuer for paying off the notes ahead of schedule, thereby ensuring the Dealer Defendants ample time to convert the maximum amount into stock.

31.    Immediately after the effective registration date when the Company's registration statements went effective, the Dealer Defendants sent conversion notices to the issuers and their transfer agents, identifying the amount to be converted and the corresponding shares to be issued to the Dealer Defendants.

32.    Upon information and belief, instead of converting/exercising the conversion/warrant shares into stock all at once, the Dealer Defendants usually sent multiple conversion/exercise notices for each convertible security.  Among other reasons, the Dealer Defendants incrementally converted/exercised into stock and sold said stock over a period of time to purposefully avoid owning more than five percent of any class of an issuer's publicly traded stock.  Far from an investment strategy, the Dealer Defendants' incremental conversion/exercise and sales were purposefully timed so that the Dealer Defendants could attempt to evade the requirement to file a "beneficial ownership report" (SEC Schedule 13D) with the SEC.

33.     Upon information and belief, the Dealer Defendants arranged for the converted/exercised shares to be transferred to their brokerage accounts as quickly as possible to ensure maximum profits and to capitalize on the conversion discount, often paying expediting fees. As part of this process, the Dealer Defendants obtained rather elusive and oftentimes inaccurate attorney opinion letters to assure brokerage firms that the converted stock was not restricted and could be resold to the public without any examination into their status as a securities dealer.

**B.     The Dealer Defendants Sold the Converted and Exercised Stock into the Public Market**

34.     Once brokers deposited the converted shares from the issuers into the Dealer Defendants' brokerage accounts, they sold the shares into the public marketplace to lock in their profits.

35.     Upon information and belief, the Dealer Defendants generally only sold as much as the market would bear, often staggering their sales over short periods of time instead of selling them all at once.

36.     The Dealer Defendants' practice was to sell the shares they had acquired in a conversion/exercise continuously on a daily or near-daily basis until they had sold all of their shares into the market.

**C.     The Dealer Defendants Earned Significant Profits from Selling Discounted Shares of Stock**

37.     Upon information and belief, the Dealer Defendants reaped large profits from their unregistered dealer activity, the majority of which resulted from the difference between the market prices they received when they sold the stock to the public, and the deeply discounted prices at which they acquired shares from the issuers, rather than from any appreciation in the stock's price.

This mechanism, which gave Defendants a spread or markup on the stock that they sold, is a common attribute of a securities dealer.

38.     Since 2010, Hudson Bay has performed *at least **120 securities transactions with at least 55 various issuers*** and has converted notes and exercised warrants into no fewer than hundreds of millions of shares of newly-issued stock that Hudson Bay subsequently sold on the secondary market for substantial profit.

39.     The following are three examples of Hudson Bay's dealings with public company issuers, which highlight how Hudson Bay purchased and funded convertible securities, exercised its conversion rights, and sold the resulting unrestricted, newly issued shares into the public markets for a profit:

- <u>Delcath Systems, Inc. (DCTH)</u>: Hudson Bay purchased a convertible security for $27,600,000; upon conversion of that security, Hudson Bay acquired *more than 40,000,000* shares of Delcath Systems stock which, upon information and belief, were sold into the market shortly thereafter for substantial profit;

- <u>Fuse Science, Inc. (DROP)</u>: Hudson Bay purchased a convertible security for $20,000; upon conversion of that security, Hudson Bay acquired *more than 20,625,000* shares of Fuse Science stock which, upon information and belief, were sold into the market shortly thereafter for substantial profit;

- <u>Real Goods Solar, Inc. (RGSEQ)</u>: Hudson Bay purchased a convertible security for $20,000; upon conversion of that security, Hudson Bay acquired *more than 20,625,000* shares of Real Goods Solar stock which, upon information and belief, were sold into the market shortly thereafter for substantial profit.

40.     Since 2018, BHP Capital has performed *at least **112 securities transactions with at least 35 various issuers*** and has converted notes and exercised warrants into no fewer than hundreds of millions of shares of newly-issued stock that BHP Capital subsequently sold on the secondary market for substantial profit.

41.     The following are three examples of BHP Capital's dealings with public company issuers, which highlight how BHP Capital purchased and funded convertible securities, exercised

its conversion rights, and sold the resulting unrestricted, newly issued shares into the public markets for a profit:

- Probility Media Corp. (PBYA): BHP Capital purchased a convertible security for $89,175; upon conversion of that security, BHP Capital acquired *more than 77,234,468* shares of Probility Media stock which, upon information and belief, were sold into the market shortly thereafter for substantial profit;

- BrewBilt Brewing Co. (SIML): BHP Capital purchased multiple convertible securities for a total of $197,000; upon conversion of that security, BHP Capital acquired *more than 277,018,820* shares of BrewBilt Brewing stock which, upon information and belief, were sold into the market shortly thereafter for substantial profit;

- Viva Entertainment Group, Inc. (OTTV): BHP Capital purchased a convertible security for $30,900; upon conversion of that security, BHP Capital acquired *more than 19,938,462* shares of Viva Entertainment stock which, upon information and belief, were sold into the market shortly thereafter for substantial profit.

42.    Upon information and belief, the Dealer Defendants used the proceeds from the sales of the shares to fund their regular business of purchasing additional convertible promissory notes and warrants.

43.    Upon information and belief, Hudson Bay continues to purchase new convertible notes and warrants, convert and/or exercise shares, and rapidly sell those newly issued shares into the market for a substantial profit.

## II.    THE DEALER DEFENDANTS' BUSINESS MODEL APPLIED TO VINCO

### A.    Hudson Bay's Securities Transactions with Vinco

*Hudson Bay Purchased (Effected) Convertible Notes (Securities)
and Warrants (Securities) from Vinco*

44.    Hudson Bay's business model—as reflected in the conduct alleged above—manifests numerous and substantial characteristics of dealer activity, consistent with ongoing SEC prosecutions and federal court decisions.

45.     Chief among these characteristics is the ability to purchase convertible notes and warrants through share purchase agreements, pursuant to which Hudson Bay acquires securities directly from an issuer through conversions and warrant exercises for their own account.

46.     The Hudson Bay Transactions in this case were executed between Hudson Bay and Vinco between January 2021 and December 2021.  Under those contracts, Hudson Bay purchased from Vinco three separate convertible notes and 11 warrants.

47.     On January 25, 2021, Hudson Bay purchased from Vinco a senior convertible promissory note in the amount of $12,000,000 with an interest rate of 6% per annum and 12-month maturity date (the "January Note") **(Exhibit 5)**.

48.     The January Note also gave Hudson Bay the right to exchange all or any portion of the debt for company stock at a conversion price of $2.00, subject to adjustments provided in the January Note.  The January Note was entered into and purchased by Hudson Bay pursuant to a Securities Purchase Agreement dated January 21, 2021 (the "January SPA") **(Exhibit 4)**.

49.     Pursuant to the January SPA,[11] Hudson Bay was also issued a warrant to purchase an aggregate of 15,000,000 shares of common stock at a per-share exercise price of $2.00 (the "January Warrant") **(Exhibit 6)**.

50.     On February 23, 2021, Hudson Bay purchased a second senior convertible note for the purchase price of $10,000,000 with an interest rate of 6% per annum and 12-month maturity date (the "February Note") **(Exhibit 9)**.  Like the January Note, the February Note contained a voluntary conversion mechanism whereby Hudson Bay had the option to convert at any time after the Issuance Date (as defined in the February Note), in whole or in part, the outstanding principal

---

[11]   The January SPA also included a Registration Rights Agreement dated January 25, 2021 (the "January RRA") **(Exhibit 7)**.

and interest under the February Note into shares of common stock at a conversion price of $4.847 per share.

51.    The February Note was entered into and purchased by Hudson Bay pursuant to a Securities Purchase Agreement dated February 18, 2021 (the "February SPA") (**Exhibit 8**).

52.    Pursuant to the February SPA, Hudson Bay also received five-year warrants to purchase an aggregate of 18,568,188 shares of the Company's common stock at a per-share exercise price of $3.722 (the "February Warrant") (**Exhibit 10**).[12]

53.    On May 24, 2021, Hudson Bay received additional warrants to purchase an aggregate of 13,070,000 shares of the Company's common stock at a per-share exercise price equal to $3.20 (the "May Warrant") (**Exhibit 13**).[13]

54.    On June 4, 2021, Hudson Bay received additional warrants to purchase an aggregate of 27,821,829 shares of the Company's common stock at a per-share exercise price equal to $3.300 (the "June Warrant") (**Exhibit 16**).[14]

55.    On July 23, 2021, Hudson Bay purchased a third senior convertible note in the amount of $120,000,000 for the purchase price of $100,000,000[15] with a 12-month maturity date (the "July Note") (**Exhibit 20**).[16]  The July Note gave Hudson Bay the right to convert at any time after the Initial Convertibility Date (as defined in the July Note), in whole or in part, the

---

[12]   The February SPA also included a Registration Rights Agreement dated February 23, 2021 (the "February RRA") (**Exhibit 11**).

[13]   The May Warrant included a Registration Rights Agreement dated May 24, 2021 (the "May RRA") (**Exhibit 14**).

[14]   The June Warrant included a Registration Rights Agreement dated June 4, 2021 (the "June RRA") (**Exhibit 17**).

[15]   The July Note was issued with a $20,000,000 original issue discount ("OID").

[16]   The July Note was later amended to include an interest rate of 6% per annum, payable quarterly.

outstanding principal and interest under the July Note into shares of common stock at a conversion price of $4.00 per share.[17]

56.     The July Note was entered into and purchased by Hudson Bay pursuant to a Securities Purchase Agreement dated July 22, 2021 (the "July SPA") (**Exhibit 19**).[18]

57.     Pursuant to the July SPA, Hudson Bay also received five-year warrants to purchase an aggregate of 32,697,548 shares of the Company's common stock at a per-share exercise price of $4.00[19] (the "July Warrant") (**Exhibit 21**).

58.     On August 18, 2021, Hudson Bay received warrants to purchase an aggregate of 20,500,000 shares of the Company's common stock at a per-share exercise price equal to $2.655 (the "August Series A Warrant") (**Exhibit 24**), and additional warrants to purchase an aggregate of 2,000,000 shares of the Company's common stock at a per-share exercise price equal to $2.655 (the "August Series B Warrant") (**Exhibit 25**) (together with the August Series A Warrant, the "August Warrants").[20]

59.     On September 1, 2021, Hudson Bay received warrants to purchase an aggregate of 20,000,000 shares of the Company's common stock at a per-share exercise price equal to $9.00 (the "September Series A Warrant") (**Exhibit 28**), and additional warrants to purchase an aggregate of 2,000,000 shares of the Company's common stock at a per-share exercise price equal

---

[17]   The conversion price of the July Note was later reduced to $0.7831.  *See* Vinco Form 8-K (filed February 6, 2023), *available at* https://www.sec.gov/Archives/edgar/data/1717556/000149315223003612/form8-k.htm.

[18]   The July SPA also included a Registration Rights Agreement dated July 22, 2021 (the "July RRA") (**Exhibit 22**).

[19]   The exercise price of the July Warrant was later reduced to $2.655.  *See* Vinco Form 8-K (filed August 18, 2021), *available at* https://www.sec.gov/Archives/edgar/data/1717556/000149315221020646/form8-k.htm.

[20]   The August Warrants included a Registration Rights Agreement dated August 18, 2021 (the "August RRA") (**Exhibit 26**).

to $9.00 (the "September Series B Warrant") (**Exhibit 29**) (together with the September Series A

Warrant, the "September Warrants").[21]

60.     On November 11, 2021, Hudson Bay received additional warrants to purchase an

aggregate of 15,000,000 shares of the Company's common stock at a per-share exercise price equal

to $4.5270 (the "November Warrant") (**Exhibit 32**).[22]

61.     On December 20, 2021, Hudson Bay received warrants to purchase an aggregate of

30,678,042 shares of the Company's common stock at a per-share exercise price equal to $3.2653

(the "December Warrant") (**Exhibit 36**).[23]

62.     Each of the aforementioned convertible notes and warrants constitute *a separate

purchase* of securities, and constitute a transaction in securities as defined in Section 15(a) of the

Act.

*Hudson Bay Converted (Performed) the Notes (Securities) and*
*Exercised the Warrants (Securities) Pursuant to the Notes and*
*Warrant Exercise Agreements with Vinco*

63.     Hudson Bay timed its conversions, exercises, and sales to coincide with the

Company's effective registration statements registering the underlying shares subject to

conversion and warrant exercises under the Hudson Bay Transactions.

64.     On May 24, 2021, the Company and Hudson Bay entered into a Warrant Exercise

Agreement (the "May WEA"),[24] whereby Hudson Bay exercised 2,870,000 January Warrants at a

---

[21]   The September Warrants included a Registration Rights Agreement dated September 1, 2021 (the "September RRA") (**Exhibit 30**).

[22]   The November Warrant included a Registration Rights Agreement dated November 11, 2021 (the "November RRA") (**Exhibit 33**).

[23]   The December Warrant included a Registration Rights Agreement dated December 20, 2021 (the "December RRA") (**Exhibit 37**).

[24]   The May WEA is annexed hereto as **Exhibit 12**.

per-share exercise price of $2.00.  As a result, Hudson Bay received 2,870,000 shares of the Company's common stock for a purchase price of $5,740,000.00.  The 2,870,000 shares had an open market value of ***$10,187,546.59*** on the date of exercise.

65.     Between June 4, 2021 and July 7, 2021, Hudson Bay exercised 1,930,000 January Warrants at a per-share exercise price of $2.00.  As a result, Hudson Bay received 1,930,000 shares of the Company's common stock for a purchase price of $3,860,000.00.  The 1,930,000 shares had an estimated open market value of ***$8,337,600.00*** during the period of exercise.[25]

66.     Between June 4, 2021 and July 7, 2021, Hudson Bay exercised 13,968,188 February Warrants at a per-share exercise price of $3.7220.  As a result, Hudson Bay received 13,968,188 shares of the Company's common stock for a purchase price of $51,989,595.74.  The 13,968,188 shares had an estimated open market value of ***$60,342,572.16*** during the period of exercise.[26]

67.     On August 18, 2021, the Company and Hudson Bay entered into a Warrant Exercise Agreement (the "August WEA"), whereby Hudson Bay exercised 4,600 February Warrants into 4,600 shares of the Company's common stock with an open market value of ***$11,452,934.64*** on the date of exercise.

68.     On September 1, 2021, the Company and Hudson Bay entered into a Warrant Exercise Agreement (the "September WEA"),[27] whereby Hudson Bay exercised 6,900,000 May Warrants at a per-share exercise price of $3.20.  As a result, Hudson Bay received 6,900,000 shares

---

[25]   The average closing price of Vinco common stock between June 4, 2021 and July 7, 2021 was $4.32.

[26]   Calculated using the same average closing price of $4.32 between June 4, 2021 and July 7, 2021.

[27]   The September WEA is annexed hereto as **Exhibit 27**.

of the Company's common stock for a purchase price of $22,080,000.00. The 6,900,000 shares had an open market value of ***$64,991,881.08*** on the date of exercise.

69.    On November 9, 2021, Hudson Bay converted $7,000,000 of principal under the July Note in exchange for 1,750,000 shares of common stock. The 1,750,000 shares had an open market value of ***$7,770,236.25*** on the date of conversion.

70.    On November 11, 2021, the Company and Hudson Bay entered into a Warrant Exercise Agreement (the "November WEA"),[28] whereby Hudson Bay exercised 2,438,700 July Warrants and 9,561,300 August Series A Warrants at a per-share exercise price of $2.6550. As a result, Hudson Bay received 12,000,000 shares of the Company's common stock for a purchase price of $31,860,000. The 12,000,000 shares had an open market value of ***$53,994,893.40*** on the date of exercise.

71.    On December 20, 2021, the Company and Hudson Bay entered into a Warrant Exercise Agreement (the "December WEA")[29], whereby Hudson Bay exercised 13,634,685 July Warrants at a per-share exercise price of $2.6550. As a result, Hudson Bay received 13,634,685 shares of the Company's common stock for a purchase price of $36,200,088.68. The 13,634,685 shares had an open market value of ***$42,945,206.20*** on the date of exercise.

72.    As of December 31, 2021, Hudson Bay fully converted $10,000,000 of principal under the February Note into 2,063,132 of the Company's common shares.

73.    On March 9, 2022, the Company and Hudson Bay entered into an amendment agreement whereby the parties agreed to, among other things, amend the July Note to convert $10,000.00 of the principal amount under the July Note at a conversion price of $0.01 (reduced

---

[28]    The November WEA is annexed hereto as **Exhibit 31**.

[29]    The December WEA is annexed hereto as **Exhibit 37**.

from the initial conversion price of $4.00) into shares of the Company's common stock.  As a result, Hudson Bay received 1,000,000 shares of the Company's common stock for a purchase price of just $10,000.  The 1,000,000 shares had an open market value of ***$2,299,785.60*** on the date of conversion.

74.    On May 12, 2022, Hudson Bay exchanged 27,840,000 December Warrants for 22,550,400 shares of the Company's common stock.  The open market value of the 22,550,400 shares on May 12, 2022 was ***$59,302,060.98***.  The Company did not receive any proceeds from this ***cashless exercise***.

75.    On May 19, 2022, Hudson Bay exchanged 500,000 November Warrants for 385,000 shares of the Company's common stock, 12,000,000 September Warrants for 6,000,000 shares and 18,090,123 December Warrants for 14,653,000 shares.  The open market value of the combined 21,038,000 shares on May 19, 2022 was ***$58,480,182.74***.  The Company did not receive any proceeds from these ***cashless exercises***.

76.    On July 5, 2022, Hudson Bay submitted alternate exercise notices to the Company with respect to (i) 14,500,000 exercise shares under the November Warrants, and (ii) 67,760,699 exercise shares under the December Warrants, for an aggregate payment equal to $33,886,612.  On July 6, 2022, the Company paid ***$33,886,612***, in cash, to Hudson Bay pursuant to the alternate exercise notices and, as a result, a total of 82,260,699 warrants held by Hudson Bay were canceled.

77.    On July 22, 2022, pursuant to the March 9, 2022 amendment to the July Note, the Company made a cash payment of ***$33,115,000***, comprising $33,000,000 of principal repayment and $115,000 of interest, to Hudson Bay.

78.     On August 18, 2022, the Company was required to purchase a portion of the outstanding July Note.  The Company purchased $55,000,000 of the principal amount under the July Note for *$65,000,000* in cash to Hudson Bay.

79.     On August 19, 2022, Hudson Bay converted $5,000,000 of principal and $46,000 of accrued interest under the July Note into shares of the Company's common stock at a conversion price of $1.00 per share.  As a result of the conversion, Hudson Bay received 5,046,000 shares of the Company's common stock, which had an open market value of *$8,604,439.20* on the date of conversion.

80.     On February 5, 2023, the Company entered into an exchange agreement with Hudson Bay pursuant to which the Company and Hudson Bay exchanged $250,000 in principal amount under the July Note for an aggregate of 26,000,000 shares of the Company's common stock.   The 26,000,000 shares received by Hudson Bay had an open market value of *$29,486,730.00* on the date of exchange.

81.     Each of the aforementioned conversions, exercises, exchanges and repurchases constitutes *a separate purchase and sale* of securities, and constitutes a transaction in securities as defined in Section 15(a) of the Act.

### Hudson Bay Quickly Sold Vinco Stock (Securities) Acquired Through Conversions and Exercises

82.     Investment is not part of Hudson Bay's business model.

83.     Hudson Bay relied on its conversion discount to maximize profits while it drove down Vinco's trading price due to the liquidation of its sizable positions.

84.     Hudson Bay's business model is substantially similar to that of the defendants in *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2016), *SEC v. Almagarby*, 479

F.Supp.3d 1266 (S.D. Fla. 2020), *SEC v. Keener*, 2020 U.S. Dist. LEXIS 146256 (S.D. Fla. Aug. 13, 2020), and *SEC v. Fife,* 2021 U.S. Dist. LEXIS 242126 (N.D. Ill. Dec. 20, 2021).

85.     Upon information and belief, as soon as Hudson Bay received the newly-issued Vinco shares, it immediately sold them into the marketplace to reap a substantial profit—even while Vinco's trading price was falling.

86.     Based on the closing prices of Vinco stock on the days of the corresponding conversions, exercises and exchanges, the estimated open market value of the 135,350,405 newly-issued Vinco shares received by Hudson Bay was approximately ***$418,196,068.*84**, which is 2.45 times the $170,905,272.41 aggregate purchase price of the Notes and warrant exercises.  Stated differently, Hudson Bay reaped, at a minimum, ***$252,959,061.79*** in profit through obtaining discounted shares under the unlawful Hudson Bay Transactions.[30]

*Gerber and Roth Control Hudson Bay's Business Operations*

87.     The HB Capital website[31] states that Gerber is the "Managing Partner, Chief Executive Officer & Chief Investment Officer" of HB Capital, the manager of Hudson Bay.

88.     The HB Capital website further details that Gerber "began his investment career in 1991, as a member of the American Stock Exchange working as an equity options market maker," and since then, he worked for several securities market participants in a variety of roles.

89.     Publicly-available information reveals that Gerber, however, has never been registered as a broker or affiliated with a registered broker/dealer firm.

---

[30]   This $252,959,061.79 "profit" figure is a markedly conservative calculation that considers only the publicly disclosed conversions, exercises, and exchanges that can be verifiably linked to a specific date (or, in the case of Plaintiff's allegations in ¶¶ 65-66, *supra*, within a reasonably short time span with minimal fluctuation in share price), thereby allowing Plaintiff to cross-reference the closing price of Vinco common shares on that date and determine an approximate open market value of the shares received.  Plaintiff anticipates that this figure will prove to be significantly greater after a reasonable opportunity for discovery.

[31]   *See* https://www.hudsonbaycapital.com/ (last accessed Jan. 19, 2024).

90.     Nonetheless, Gerber—during all times relevant hereto—possessed and exercised ultimate decision-making and control over Hudson Bay (alongside Roth), including the power to decide whether to enter into each of the securities transactions (including the Hudson Bay Transactions) to negotiate and approve the final deal terms, and to direct the timing of conversions, exercises, and subsequent sales of the newly-issued shares of common stock.

91.     The HB Capital website[32] states that Roth is the "Managing Partner & Portfolio Manager" of HB Capital, the manager of Hudson Bay.

92.     The HB Capital website further details that Roth "began his career at UBS in 1999 as a Research Analyst on the convertibles desk," and since then, has worked alongside Gerber for several securities market participants in a variety of roles.

93.     Publicly-available information reveals that Roth, however, has never been registered as a broker or affiliated with a registered broker/dealer firm.

94.     Nonetheless, Roth—during all times relevant hereto—possessed and exercised ultimate decision-making and control over Hudson Bay (alongside Gerber), including the power to decide whether to enter into each of the securities transactions (including the Hudson Bay Transactions) to negotiate and approve the final deal terms, and to direct the timing of conversions, exercises, and subsequent sales of the newly-issued shares of common stock.

95.     Demonstrative of Roth's control over Hudson Bay is that the Hudson Bay Transactions, including the initial contracts and amendments or subsequent agreements thereto, are each executed by Roth in his capacity as the Managing Partner and Portfolio Manager of HB Capital.

---

[32]   *See* https://www.hudsonbaycapital.com/ (last accessed Jan. 19, 2024).

96.     Gerber and Roth, therefore, were and currently are the persons with the power to direct, authorize, and compel Hudson Bay to enter into, convert, and subsequently sell securities through convertible notes with issuers, including the Hudson Bay Transactions with Vinco.

97.     Thus, Gerber and Roth are each a "control person" within the meaning of Section 20(a) of the Act and had the power and ability to cause Hudson Bay to engage in the unlawful conduct described herein.

**B.      BHP Capital's Securities Transactions with Vinco**

*BHP Capital Purchased (Effected) Warrants (Securities) from Vinco*

98.     BHP Capital's business model manifests numerous and substantial characteristics of dealer activity, consistent with ongoing SEC prosecutions and federal court decisions.

99.     Chief among these characteristics is the ability to purchase convertible notes and warrants through share purchase agreements, pursuant to which BHP Capital acquires securities directly from an issuer through conversions and warrant exercises for their own account.

100.    The BHP Transactions in this case were executed between BHP Capital and Vinco between January 2021 and July 2021.  Under those contracts, Hudson Bay purchased from Vinco three separate warrants.

101.    On January 28, 2021, BHP Capital was issued a five-year warrant to purchase an aggregate of 1,500,000 shares of Vinco common stock at a per-share exercise price of $2.20 (the "BHP January Warrant") **(Exhibit 40)**.[33]

102.    On June 4, 2021, BHP Capital and the Company entered into a warrant exercise agreement, pursuant to which BHP Capital agreed to exercise a portion of the BHP January

---

[33]   The BHP January Warrant was issued pursuant to a Securities Purchase Agreement between BHP Capital and Vinco dated January 28, 2021 (the "BHP January SPA") (**Exhibit 39**).  The BHP January SPA included a Registration Rights Agreement between BHP Capital and Vinco dated January 28, 2021 (the "BHP RRA") ("**Exhibit 41**").

Warrant and the Company agreed to issue additional warrants to purchase an aggregate of 1,500,000 shares of Vinco common stock at a per-share exercise price of $3.20 (the "BHP June Warrant") **(Exhibit 42)**.[34]

103.    On July 23, 2021, Vinco entered into a securities purchase agreement (the "BHP July SPA") with BHP Capital whereby Vinco agreed to (i) issue and sell to BHP Capital up to 1,007,194 shares of Vinco's common stock, par value $0.001 per share at a purchase price of $2.78 per share and (ii) issue warrants to purchase up to 1,007,194 shares of Vinco's common stock with an exercise price of $2.78 per share, resulting in an aggregate of $2,800,000 of purchased shares and warrants (the "BHP July Warrant").[35] The warrants were immediately exercisable and had a term of exercise equal to three years.

104.    Each of the aforementioned transactions constitute *a separate purchase* of securities, and constitute a transaction in securities as defined in Section 15(a) of the Act.

<u>*BHP Capital Exercised (Performed) the Warrants (Securities)*</u>

105.    During the nine months ended September 30, 2021, BHP Capital fully exercised the 1,500,000 warrant shares under the BHP January Warrant.

106.    Upon information and belief, BHP Capital also fully exercised its warrant shares under the BHP June Warrant and BHP July Warrant.

107.    Each of the exercises performed by BHP Capital constitutes *a separate purchase and sale* of securities, and constitutes a transaction in securities as defined in Section 15(a) of the Act.

---

[34]    The BHP January Warrant was issued pursuant to a Securities Purchase Agreement between BHP Capital and Vinco dated January 28, 2021 (the "BHP January SPA") **(Exhibit 39)**.  The BHP January SPA included a Registration Rights Agreement between BHP Capital and Vinco dated January 28, 2021 (the "BHP RRA") ("**Exhibit 41**").

[35]    Pursuant to the BHP July SPA, BHP Capital and Vinco entered into a Registration Rights Agreement dated July 23, 2021 (the "BHP July RRA").

*BHP Capital Quickly Sold Vinco Stock (Securities)*
*Acquired Through Warrant Exercises*

108.    Investment is not part of BHP Capital's business model.

109.    Upon information and belief, as soon as BHP Capital received the newly-issued Vinco shares, it immediately sold them into the marketplace and derived substantial profits due to the discounted acquisition price, as opposed to appreciation in the market price of Vinco common stock.

*Pantofel Controls BHP Capital's Business Operations*

110.    Publicly-available information reveals that Pantofel has never been registered as a broker or affiliated with a registered broker/dealer firm.

111.    At all relevant times, however, Pantofel possessed and exercised ultimate and final decision-making authority and control over BHP Capital, including the power to decide whether to enter into each of the BHP Transactions, to negotiate and approve the final deal terms, and to direct the timing of exercises and subsequent sales of the newly issued shares of discounted common stock.

112.    Pantofel was the signatory to all the BHP Transactions and was the sole individual responsible for committing BHP Capital to each agreement.

113.    Upon information and belief, Pantofel controlled BHP Capital's bank accounts and brokerage accounts, authorized the funding wires, and executed the documents needed to deposit the converted shares into BHP Capital's brokerage accounts.

114.    Pantofel, therefore, was and currently is the sole individual with the power to direct, authorize, and compel BHP Capital to enter into, convert, and subsequently sell securities through convertible notes and warrants with issuers, including the BHP Transactions with Vinco.

115.     Thus, Pantofel is a "control person" within the meaning of Section 20(a) of the Act and had the power and ability to cause BHP Capital to engage in the unlawful conduct described herein.

**C.     The Dealer Defendants Violated Federal Securities Laws by Engaging in Dealer Behavior**

116.     The Dealer Defendants' purchase of convertible notes and warrants (securities transaction), conversions of debt and exercises of warrant shares into common stock (securities transaction), and subsequent stock sales of securities (securities transaction) are part of an ongoing business.   The Dealer Defendants acquire large volumes of shares privately from issuers at a substantial discount to market, sell large volumes of shares back into the open market for substantial profit due to the conversion discount, and always do so absent investment intent.   The Dealer Defendants do all of this—buy, convert, and sell securities—as part of their regular business for their own account.

117.     Upon information and belief, the Dealer Defendants made use of the mails, email, and other instrumentalities of interstate commerce to effect the securities transactions under the Securities Agreements.   For example, the Dealer Defendants used the internet to solicit stock issuers, transferred cash through wire transfers, and used email and telephone communications to negotiate and effectuate sales transactions through their brokers.

118.     Upon information and belief, the Dealer Defendants paid several independent contractors to assist them in locating, negotiating, and managing their transactions.

119.     By failing to comply with the dealer registration requirements and federal securities laws, the Dealer Defendants purposefully "operated under the radar" to avoid important regulatory obligations that govern dealer conduct in the marketplace, including submitting to regulatory

inspections and oversight by the SEC and the Financial Industry Regulatory Authority ("FINRA"), following financial responsibility rules, and maintaining books and records.

120.    The dealer registration requirements provide important safeguards for the investing public, shareholders, and companies.  For example, registration with the SEC requires the dealer to disclose important information about its business, including but not limited to:  (a) the names of the direct and indirect owners and executive officers of the business; (b) certain arrangements with other persons or entities; (c) the identities of those who control the business; (d) the states in which the dealer does business; (e) past criminal or regulatory actions against the dealer or any affiliated person that controls the business; and (f) financial information, including bankruptcy history. Further, registration requires the dealer to join a self-regulatory organization, such as FINRA, or a national security exchange, which assists the SEC in regulating the activities of registered dealers. Finally, registered dealers are subject to inspection by the SEC and FINRA to ensure that they comply with the securities laws.

121.    Further, a person who engages in dealer activity must file an application on a form called Form BD, which asks questions about the applicant and its principals, controlling persons, and employees.  An applicant must file the Form BD with the Central Registration Depository, which is operated by FINRA.  The excessive compensation and patently unfair terms used in the Securities Agreements (and the Dealer Defendants' transactions with other issuers) would have violated FINRA Rules 5110(b)(4)(B) and 5110(c)(2)(A), and hence could not have been effected by a registered securities dealer.

122.    In light of the difficulty of assessing damages, the equitable remedy of rescission indicated by § 29(b) of the Act,[36] voiding and rescinding the Securities Agreements (to return the

---

[36]    *See also Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970), wherein the U.S. Supreme Court held that there is a private right of action for rescission based on a violation of the '33 Securities Act.

parties to their pre-contract position) should be effectuated by mandating the Dealer Defendants to return to Vinco every share of stock it acquired under the Securities Agreements (or the cash equivalent thereof), less the net sum provided to Vinco for the purchase of the Securities Agreements.

123.    Vinco is further entitled to statutory prejudgment interest on the value of the stock and the cash payments.

124.    In the alternative, the Dealer Defendants should pay rescissory damages in an amount constituting the full market value of the stock wrongfully acquired and cash amounts received, both with statutory prejudgment interest.

125.    Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC or, in the case of a natural person, associate with a registered dealer.  *See* § 78o(a)(1).

126.    While the Dealer Defendants engaged in this conduct, they were not registered with the SEC as dealers or associated with dealers registered with the SEC.

127.    Upon information and belief, neither the Company nor its shareholders were aware that the Dealer Defendants were engaged in unregistered dealer activities.

## DERIVATIVE ALLEGATIONS

128.    Plaintiff brings this action derivatively and for the benefit of Vinco to redress injuries suffered, and to be suffered, as a result of the Defendants' violations of the Act.

129.    Vinco is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

130.    Plaintiff is, and has continuously been at all relevant times, a shareholder of Vinco. Plaintiff will adequately and fairly represent the interests of Vinco in enforcing and prosecuting its rights, and, to that end, has retained competent and experienced counsel to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

131.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

132.    For the reasons set forth below, a pre-suit demand on the Company's two current directors is futile and, therefore, excused.

**A.    There is No Functioning Board of Directors to Even Consider a Demand**

133.    As an initial matter, Vinco is, for all intents and purposes, an inoperative company with no functioning board of directors.

134.    The Company and its current and former directors and officers have been embroiled in no less than *eight civil lawsuits* and *two criminal indictments* since 2022:

- *The State of Nevada v. Jesse Law, et al.*, No. C-23-379122-3 (Nev. Dist. Ct., Clark Cty.);

- *U.S. v. Theodore Farnsworth, et al.*, No. 1:22-cr-20521-RNS (S.D. Fla.);

- *SEC v. Theodore J. Farnsworth, et al.*, No. 1:22-civ-08226 (S.D.N.Y.);

- *Coulibaly v. Roderick Vanderbilt, Jesse Law, et al.*, No. A-23-871337-B (Nev. Dist. Ct., Clark Cty.);

- *Vinco Ventures, Inc. v. Theodore Farnsworth, Roderick Vanderbilt, et al.*, No. A-22-856404-B (Nev. Dist. Ct., Clark Cty.);

- *Vinco Ventures, Inc. v. Theodore Farnsworth, Roderick Vanderbilt, et al.*, No. E2022005847 (N.Y. Sup. Ct., Monroe Cty.);

- *Mediant Communications Inc. v. Vinco Ventures, Inc.*, No. 654840/2022 (N.Y. Sup. Ct., New York Cty.); and

- *Gianniny Associates, LLC et al v. Vinco Ventures Inc., Roderick Vanderbilt, et al.* No. E2023004794 (N.Y. Sup. Ct., Monroe Cty.);

- *Vick v. Roderick Vanderbilt, Jesse Law, et al.*, No. A-23-868781-B (Nev. Dist. Ct., Clark Cty.); and

- *Casa Associates LLC v. Zash Global Media and Entertainment Corporation*, No. E2023000037 ((N.Y. Sup. Ct., Monroe Cty.).

135.    Vanderbilt was named as a defendant in five of the eight above-referenced cases, which alleged, *inter alia*, breaches of fiduciary duty, corporate waste, and civil conspiracy.  Law was also named as a defendant in three of those cases.

136.    Recently, in *Coulibaly v. Roderick Vanderbilt, Jesse Law, et al.*, No. A-23-871337-B (Nev. Dist. Ct., Clark Cty.), the court ***denied*** Vanderbilt and Law's motion to dismiss the plaintiff's claims of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, civil conspiracy, unjust enrichment, and corporate waste.

137.    The events giving rise to the above-referenced cases ultimately resulted in the Company's delisting from Nasdaq, the evaporation of the Company's assets, an unfathomable loss of market capitalization to the detriment of the Company and its shareholders, and the resignation of the Company's directors and officers.

138.    To wit, on May 3, 2023, the Company's board of directors consisted of five individuals: Roderick Vanderbilt, Jesse Law, Richard Levychin, Lisa King, and Brian Hart.

139.    On July 5, 2023, Vinco filed a Form 8-K indicating that three of its five directors were to resign.[37]  On June 27, 2023, independent director Richard Levychin resigned as a board member effective immediately and director Lisa King resigned as a board member effective June

---

[37]   *See* Vinco Form-8-K (filed July 5, 2023), *available at*
https://www.sec.gov/Archives/edgar/data/1717556/000149315223023451/form8-k.htm.

28, 2023.  On June 29, 2023, independent director Brian Hart resigned as a board member effective immediately.

140.    Therefore, at the time of the filing of this action, the Board consists of just ***two*** individuals: Roderick Vanderbilt and Jesse Law.

141.    Vinco's Articles of Incorporation provides that "[t]he number of directors which constitutes the whole board of directors of the corporation shall be designated in the bylaws of the corporation."  *See* **Exhibit 43** ("Vinco Articles of Incorporation").  Vinco's bylaws state that the board "shall consist of at least three (3) and not more than seven (7) directors…"  *See* **Exhibit 44** ("Vinco bylaws").

142.    Vinco is therefore in violation of its own Articles of Incorporation and bylaws and lacks the requisite number of directors to even consider a demand.  A pre-suit demand would therefore be impracticable and futile.

143.    Additionally, Plaintiff brings this action on behalf of the Company for the benefit of the Company and its shareholders.  Given Vanderbilt and Law's ongoing involvement with allegations of corporate misconduct, Plaintiff has no reason to believe that Vanderbilt and Law have the best interests of the Company in mind such that they can properly consider a shareholder demand in the first place.

144.    Moreover, on December 6, 2023, Law was indicted by the Clark County Grand Jury for (1) offering a false instrument for filing or record, a Category "C" felony in violation of NRS 239.330, and (2) uttering forged instruments: forgery, a Category "D" felony in violation of

NRS 205.110.[38]  Plaintiff respectfully submits that in light of Law's recent indictment, a pre-suit demand upon him would be impracticable.

### B.     Demand is Excused Because Both Vanderbilt and Law Are Not Independent

145.   Both Vanderbilt and Law have disabling interests that make them incapable of considering a shareholder demand.

146.   Vanderbilt and Law are not independent by definition, due to their simultaneous roles as ZASH Managers on the board of directors of one of the Company's subsidiaries—ZVV Media Partners, LLC ("ZVV").

147.   The Company's Corporate Governance Guidelines, Article 5 states:

> It is the policy of the Company that at least a majority of the Directors meet the NASDAQ Stock Exchange ("NASDAQ") Listing Standard' "independence" requirements. Annually, the Nominating & Governance Committee of the Board reviews all relevant information, not merely from the standpoint of the Director, but also from that of persons or organizations with which the Director has an affiliation and makes recommendation to the Board concerning the independence of the Directors. Based on those recommendation, the Board makes an affirmative determination as to the independence of each Director. The Board has established categorical standards to assist in making such determinations. Such standards are set forth in Annex A hereto.

**Exhibit 45** ("Vinco Corporate Governance Guidelines").

148.   The Company's Corporate Governance Guidelines, Annex A states:

> A Director will not be considered independent if the Director, his wife, registered partner or other life companion, foster child or relative by blood or marriage up to the second degree as defined by Dutch law: is, or within the last five years has been, an employee or member of the Management Board of the Company or any of its subsidiaries; [or] has had an important business relationship with the Company or a Company associated with it, in the year prior to the appointment…

---

[38]   *See The State of Nevada v. Jesse Law, et al.*, No. C-23-379122-3 (Nev. Dist. Ct., Clark Cty.) (Indictment), *available at* https://ag.nv.gov/uploadedFiles/ag.nv.gov/Content/News/PR/PR_Docs/2022(1)/Indictment%20-%20SIgned-Law.pdf.

*Id.*

149.    As of January 21, 2021, the Company had a membership interest of 50% in ZVV, which, according to the Company's own Form 10-K filed on April 15, 2022, is a subsidiary of the Company.  *See* **Exhibit 46** ("Subsidiaries of Vinco").

150.    Because both Vanderbilt and Law have served as ZASH Managers on the board of ZVV, they are, by definition, not independent.

151.    Vanderbilt and Law are also beholden to Farnsworth, who, by his own admission, "*raised the capital to acquire Lomotif, AdRizer, Mind Tank, Honeybadger, and others to build this vision and raise hundreds of millions of dollars.*"  *See* **Exhibit 47** ("Farnsworth Letter").  Shortly after that letter, Farnsworth was indicted, and is now incarcerated.  In the words of the Honorable Robert N. Scola, Jr.,

> The evidence before the Court clearly establishes that, to the contrary, Farnsworth consistently violated his conditions of release, in the manner of a person that does not believe the rules apply to him.  In short, the Government has provided ample evidence that Farnsworth has no respect for the law or Court orders, that he has an established pattern of withholding and concealing information from law enforcement and others, and that neither his indictment nor his conditions of release deterred him from committing new crimes.

*U.S. v. Theodore Farnsworth, et al.*, No. 1:22-cr-20521-RNS (S.D. Fla.) (ECF 94).

152.    Indeed, Farnsworth was the primary individual responsible for obtaining the financing that is the subject of this litigation.

153.    Upon information and belief, Farnsworth, Vanderbilt, Law, and other non-parties to this litigation used the funding obtained under the Securities Transactions to engage in, *inter alia*, self-dealing, mismanagement, corporate waste, breach of fiduciary duty, and fraud.

154.    Vanderbilt, who has a pre-existing personal and business relationship with Farnsworth, has demonstrated his preference for loyalty over prudent corporate governance, as

indicated in the matters of *Vinco Ventures, Inc. v. Theodore Farnsworth, Roderick Vanderbilt, et al.*, No. A-22-856404-B (Nev. Dist. Ct., Clark Cty.) and *Coulibaly v. Roderick Vanderbilt, Jesse Law, et al.*, No. A-23-871337-B (Nev. Dist. Ct., Clark Cty.).

155.   As such, Vanderbilt has a significant conflict of interest that would prevent him from impartially considering a demand to initiate litigation against the very parties responsible for providing the funding which, upon information and belief, was used by Farnsworth, Vanderbilt, Law, and other non-parties to unjustly enrich themselves to the detriment of the Company and its shareholders. Thus, demand upon Vanderbilt is futile.

156.   Law, who was appointed by Farnsworth to become a ZASH member on the board of directors of ZVV, also has a significant conflict of interest that would prevent him from impartially considering a demand to initiate litigation against the very parties responsible for providing the funding which, upon information and belief, was used by Farnsworth, Vanderbilt, Law, and other non-parties to unjustly enrich themselves to the detriment of the Company and its shareholders.  Thus, demand upon Law is futile.

157.   For all of the reasons set forth above, both Vanderbilt and Law, and, if not both of them, at least one of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CAUSES OF ACTION

## COUNT I:

### *Rescission Pursuant to Section 29(b) of the Act for Violation of Section 15(a) of the Act for Unlawfully Effecting (Making) the Securities Contracts as an Unregistered Dealer*
**(Against the Dealer Defendants)**

158.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

159.     Section 29(b) of the Act provides, in relevant part:

> **Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder … shall be void** (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or … engaged in the performance of any such contract…

§ 78cc(b) (emphasis added).

160.     The Securities Agreements were made in violation of Section 15(a) of the Act [§ 78o(a)(1)], which prohibits unregistered dealers from using any means of interstate commerce to effect transactions in securities.

161.     The Dealer Defendants are securities dealers within the meaning of the Act.  *See* § 78c(a)(5).

162.     The Dealer Defendants are not registered as dealers with the SEC or with any other regulatory body, as required by Section 15(a) of the Act [§ 78o(a)(1)].

163.     The Dealer Defendants effected transactions in securities when they executed the Securities Agreements and when they converted and sold or caused to be sold the Vinco stock obtained thereby.

164.    The Dealer Defendants used the means of interstate commerce to effect the Securities Agreements, such as the use of an internet website, wiring of cash through wire transfers, and use of email and telephone communications to negotiate or effectuate transactions.

165.    As parties to the Securities Agreements, Hudson Bay and BHP Capital are in contractual privity with Vinco.

166.    The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, Vinco, as an issuer, is within the class of persons that the Act was designed to protect.

167.    Because the Dealer Defendants, as unregistered securities dealers, utilized the means and instrumentalities of interstate commerce when it effected the transactions in securities known herein as the Securities Agreements, the Securities Agreements were unlawful when made.

### COUNT II:

***Rescission Pursuant to Section 29(b) of the Act for Violation of
Section 15(a) of the Act for Unlawfully Transacting in Securities
Via Performance of the Agreements as an Unregistered Dealer***
**(Against the Dealer Defendants)**

168.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

169.    Section 29(b) of the Exchange Act provides in relevant part that:

> **Every contract** … (including any contract for listing a security on an exchange) heretofore or hereafter made, **the performance of which involves the violation of**, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, **shall be void** (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or … **engaged in the performance of** any such contract…

§ 78cc(b) (emphasis added).

170.    The Securities Agreements were performed in violation of Section 15(a) of the Act [§ 78o(a)(1)], which prohibits unregistered dealers from using the means of interstate commerce to effect any transaction in securities.

171.    The Dealer Defendants are securities dealers within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

172.    The Dealer Defendants are not registered as securities dealers with the SEC or with any other regulatory body, as required by Section 15(a) of the Act [§ 78o(a)(1)].

173.    The Dealer Defendants effected transactions in securities in performance of the Securities Agreements when they converted debt into stock, exercised/exchanged warrants, and sold (or caused to be sold) the Vinco stock acquired thereby (hereinafter "Performance Transactions").

174.    The Dealer Defendants used the means of interstate commerce to effect the Performance Transactions, such as wiring cash through wire transfer, or using email and telephone communications to negotiate and effectuate sales transactions through their broker.

175.    As a parties to the Securities Agreements, Hudson Bay and BHP Capital are in contractual privity with Vinco.

176.    The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, Vinco, as an issuer, is within the class of persons that the Act was designed to protect.

177.    Because the Dealer Defendants are unregistered dealers and used the means and instrumentalities of interstate commerce to effect transactions in securities when they performed under the Securities Agreements, the Securities Agreements were **unlawful as performed** (via the

conversions, warrant exercises, warrant exchanges, and sales of the stock acquired thereby into the public market).

<h2 style="text-align:center"><u>COUNT III</u>:</h2>

***Violation of Section 20(a) of the Act by Gerber and Roth as the Control Persons of Hudson Bay and by Pantofel as the Control Person of BHP Capital Based on the Dealer Defendants' Transactions in Securities as Unregistered Dealers***
**(Against Gerber, Roth, and Pantofel)**

178.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

179.    Gerber and Roth had the power and authority to cause Hudson Bay to engage in the wrongful conduct described in the First and Second Claims for Relief herein.

180.    Pantofel had the power and authority to cause BHP Capital to engage in the wrongful conduct described in the First and Second Claims for Relief herein.

181.    Gerber and Roth did in fact cause Hudson Bay to engage in the wrongful conduct described herein (including Counts I and II).

182.    Pantofel did in fact cause BHP Capital to engage in the wrongful conduct described herein (including Counts I and II).

183.    Gerber, Roth, and Pantofel did not act in good faith.

184.    Gerber, Roth, and Pantofel directly and/or indirectly induced the acts and conduct that constitute the violations in this case.

185.    Therefore, Gerber and Roth acted as control persons of Hudson Bay within the meaning of § 20(a) of the Act (15 U.S.C. § 78t), and Pantofel acted as the control person of BHP Capital within the meaning of § 20(a) of the Act (15 U.S.C. § 78t).

## COUNT IV:

### *Unjust Enrichment*
### (Against All Defendants)

186.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

187.    Defendants have received valuable benefits from Vinco, including, *inter alia*, the stock and profits realized from the sale of the unlawfully issued shares of Vinco common stock.

188.    These benefits are the result of the wrongful conduct alleged herein in Counts I-III.

189.    Defendants have unjustly retained these benefits at Vinco and its stockholders' expense.

190.    As a result, Defendants have been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a Verdict and Judgment against the Defendants herein as follows:

**A.  On Count I (Against the Dealer Defendants):**

    a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiff requests the Court to declare that:

        i.  The Securities Agreements are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

        ii.  The Dealer Defendants are operating as unregistered dealers in securities, in violation of the Act (15 U.S.C. § 78o);

        iii.  The Securities Agreements are void and subject to rescission under the Act (15 U.S.C. § 78cc); and

      iv.    Hudson Bay is entitled to retain only the principal amount of the loans made pursuant to the Hudson Bay Notes.

  b.  Plaintiff requests that the Court enter an Order:

      i.    Rescinding the Securities Agreements pursuant to the Act (15 U.S.C. § 78cc);

      ii.    Awarding rescissory damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Securities Agreements;

      iii.    Requiring Hudson Bay to return to Vinco the cash equivalent of all Vinco stock obtained via the Hudson Bay Transactions, less the principal amount originally loaned to Vinco under the Hudson Bay Notes;

      iv.    Requiring BHP Capital to return to Vinco the cash equivalent of all Vinco stock obtained via the BHP Transactions; and

      v.    Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Securities Agreements.

**B.  On Count II (Against the Dealer Defendants):**

  a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiff requests the Court to declare that:

      i.    The Securities Agreements are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

      ii.    The Dealer Defendants are operating as unregistered dealers in securities, in violation of the Act (15 U.S.C. § 78o);

      iii.    The Securities Agreements are void and subject to rescission under the Act

41

(15 U.S.C. § 78o); and

  iv. Hudson Bay is entitled to retain the principal amount of the loans made pursuant to the Hudson Bay Notes, already repaid by Vinco.

 b. Plaintiff requests that the Court enter an Order:

  i. Rescinding the Securities Agreements pursuant to the Act (15 U.S.C. § 78o);

  ii. Awarding rescissory damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Securities Agreements;

  iii. Requiring the Dealer Defendants to return to Vinco the value of all Vinco stock obtained via the Securities Agreements; and

  iv. Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Securities Agreements.

**C. On Count III (Against Gerber, Roth, and Pantofel):**

 a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiff requests the Court to declare that:

  i. Gerber and Roth had the power and authority to cause Hudson Bay to engage in the wrongful conduct described in Counts I and II herein;

  ii. Gerber and Roth did in fact cause Hudson Bay to engage in the wrongful conduct described in Counts I and II herein;

  iii. Gerber and Roth acted as control persons of Hudson Bay within the meaning of § 20(a) of the Act (15 U.S.C. § 78t(a));

  iv. Pantofel had the power and authority to cause BHP Capital to engage in the

wrongful conduct described in Counts I and II herein;

    v.  Pantofel did in fact cause BHP Capital to engage in the wrongful conduct described in Counts I and II herein; and

    vi.  Pantofel acted as the control person of BHP Capital within the meaning of § 20(a) of the Act (15 U.S.C. § 78t(a));

b.  Plaintiff requests that the Court enter an Order, pursuant to Section 20(a) of the Act (15 U.S.C. § 78t(a)), holding Gerber and Roth jointly and severally liable with and to the same extent as Hudson Bay is liable to Vinco under Counts I, II, and IV herein, and holding Pantofel jointly and severally liable with and to the same extent as BHP Capital is liable to Vinco under Counts I, II, and IV herein.

**D.  On Count IV (Against All Defendants):**

a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiff requests the Court to declare that:

    i.  Defendants have voluntarily accepted and retained the property conferred by Vinco on the Defendants through and as a result of violations of the Act (15 U.S.C. § 78o); and

    ii.  The circumstances are such that it would be inequitable for the Defendants to retain the property conferred on them by Vinco without first paying the value thereof to Vinco, to prevent the Defendants from being unjustly enriched.

    iii.  Plaintiff requests that the Court enter an Order requiring the Hudson Bay Defendants to return to Vinco the value of the property they have unjustly retained in an amount to be determined at trial, but in no event less than

$252,959,061.79, and the BHP Defendants to return to Vinco the value of the property they have unjustly retained in an amount to be determined at trial.

    iv.   Alternatively, Plaintiff requests that the Court enter an order imposing a constructive trust on Vinco's property in the possession of the Defendants as a result of the benefits conferred on them by Vinco.

**E.  As to each of Counts I-IV**, to the extent permitted by applicable law, and not otherwise requested, Plaintiff requests that the Court enter an Order:

    a.   Awarding Vinco compensatory, direct, and consequential damages;

    b.   Awarding Vinco punitive damages to deter the Defendants from continuing to engage in the same wrongful and unlawful transactions;

    c.   Awarding Plaintiff its attorneys' fees and costs associated with this litigation;

    d.   Entering an award of monetary damages jointly and severally against the Hudson Bay Defendants;

    e.   Entering an award of monetary damages jointly and severally against the BHP Defendants; and

    f.   Awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues properly so tried.


Dated: January 21, 2024                    Respectfully submitted,

                                           */s/ Mark R. Basile*
                                           Mark R. Basile, Esq.
                                           Waleed Amer, Esq.
                                           **THE BASILE LAW FIRM, P.C.**
                                           390 N. Broadway, Ste. 140
                                           Jericho, NY 11753
                                           Tel.:   (516) 455-1500
                                           Fax:    (631) 498-0748
                                           Email: mark@thebasilelawfirm.com
                                                  waleed@thebasilelawfirm.com

                                           *Counsel for Plaintiff*

**VERIFICATION**

I, Shadwrick J. Vick, am the plaintiff in the within action.  I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __21__ day of __JANUARY__, 2024.


_____
Shadwrick J. Vick